THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALBERT ATKINS, Defendant-Appellant.

Fifth District   No. 74-427

Opinion filed July 9, 1976.

Stephen P. Hurley and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Robert L. Craig, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE KARNS delivered the opinion of the court:

Defendant-appellant Albert Atkins was convicted of two counts of murder after a jury trial in St. Clair County and was sentenced to serve concurrent terms of from 100 to 300 years. On appeal he contends that he was not proven guilty beyond a reasonable doubt, that he was denied a fair trial by the prejudicial closing argument of the prosecutor and that the sentences are excessive.

Sometime between 10 and 10:30 p.m. on March 8, 1974, Lulu Mannings and Bonnie (Buddy) Doby were brutally murdered in front of Mannings' apartment. An autopsy revealed that she died as a result of massive skull fractures caused by the repeated blows of a blunt object. Doby, Mannings' fiance, died of a gunshot wound through the chest. Police found part of a rifle near the bodies. The stock, which had been broken off, was discovered in a grassy area near the apartment. The police also found an automatic pistol on the victim Doby's body.

Defendant had been Lulu Mannings' husband for about six years prior to February 8, 1974, and had lived with her in the apartment in front of which the murders occurred. Two young daughters of Mannings' were eyewitnesses to the murders. Sandra Mannings testified that on the night of the crimes she looked out an upstairs window of the apartment in which she lived and saw defendant beating her mother with a gun. Sharon Mannings testified that just prior to the time she saw her mother and Buddy Doby killed, she saw defendant in the back of the house near the garbage can with something in his hand. Sharon then saw the accused come around the house and shoot Doby with a gun. She stated she heard defendant shoot again and her mother screaming. Sharon was positive she saw defendant begin beating her mother with a rifle.

Immediately after the murders Sharon and Sandra Mannings came to Lillie Wicks' apartment. Mrs. Wick's testimony that the girls were in an incoherent state is corroborative of the girls' testimony that they had just observed the murders. Mrs. Wicks stated that, although she remained in her apartment, she looked where the girls pointed and saw two bodies. Liberal use of photographs of the apartment buildings near the scene of the crime was made at trial. Mrs. Wicks pointed out her apartment and the Mannings' apartment for the jury.

William Jeffries, a friend of defendant's, testified that he had been drinking with defendant the afternoon before the murders were committed and had dropped defendant off two blocks from Mannings' house at about 9 p.m. Jeffries described a sweater that defendant was wearing and testified that defendant told him that his ex-wife was "going with a Buddy and he was going to get him." A prior inconsistent statement was brought out that Jeffries had told the police that he had left defendant at his home at 9 p.m. Jeffries stated, however, that he had made the statement to protect defendant but now told the truth because of his fear of being charged with perjury. Defendant's niece testified that Jeffries admitted to her that he had left defendant at his home and that he had changed his story to secure release from custody.

Buddy Doby's sister testified that she saw defendant drive by Doby's home several times on the day before the killings. Mrs. Janice Pegues, Mannings' neighbor, testified that she found a sweater behind her apartment which she had seen defendant wear on a number of occasions. She found the sweater on the morning after the murders and stated that it had not been there the day before.

Defendant attempted to establish an alibi that he was at home at the time of the murders and introduced the testimony of his landlord to support his contention. Defendant denied having committed the murders or being at the scene. Defendant also attempted to impeach the Mannings girls by proof of prior inconsistent statements.

Defendant first contends that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Direct as well as strong circumstantial evidence was presented that defendant murdered Lulu Mannings, from whom he had been divorced only one month, and her fiance, Buddy Doby. Although defendant initially questions the competency of Sandra and Sharon Mannings to testify because of their ages, mental abilities and education, his argument lacks merit. Defense counsel offered no objections to the testimony of these witnesses on the ground of competency. We would thus be inclined to deem defendant's argument waived. Furthermore, the record shows that the two girls were competent to testify. The assistant State's attorney established that each witness understood her moral duty to tell the truth. Each witness was shown to be attending school at the time of the murders and during the trial. The fact that Sandra Mannings was enrolled in a special education class for "slow people" was a factor for the jury to consider in determining the weight to be given her testimony. But this circumstance did not render her testimony unworthy of belief. Clearly, no basis exists for defendant's argument that these witnesses' testimony should be discredited. *People v. Edwards*, 55 Ill. 2d 25, 302 N.E.2d 306 (1973); *People v. Ballinger*, 36 Ill. 2d 620, 225 N.E.2d 10 (1967).

The record also fails to substantiate defendant's claim that the girls' identification was uncertain. Although Sandra saw only the top of defendant's head and his body, she positively identified defendant, who had been her stepfather for six years. Sharon's identification was also positive.

■■ The gravamen of defendant's attack upon the Mannings girls' credibility concerns the girls' ability as eyewitnesses to observe the scene of the crime. Ability to observe is, of course, a matter for the jury to determine. (*People v. Stringer*, 129 Ill. App. 2d 251, 264 N.E.2d 31 (1st Dist. 1970), *aff'd*, 52 Ill. 2d 564, 289 N.E.2d 631 (1972).) Sharon testified that a light illuminated the back door area of her apartment when she saw defendant there. No testimony, however, was elicited to show that direct lighting existed in front of the Mannings' apartment where the murders occurred; however, no evidence suggested the lack of lighting. We believe that sufficient evidence existed in the record to establish the girls' ability to observe the defendant in the act of murdering his victims.

Nor can we accept defendant's argument that the girls' credibility was seriously impaired by prior inconsistent statements or discrepancies in their testimony. At trial neither witness contradicted herself on any significant detail. Sharon Mannings testified during direct examination that she had seen defendant run and get into his car after the slayings. On cross-examination, she stated that she had told police that she saw defendant get out of an orange and white car, approach her mother and

start beating her. Later during cross-examination, she retracted her statement that she had told the police what she had seen. This minor inconsistency merely raised a question of credibility for the jury.

Defendant called East St. Louis Police Officer Carliss Childerous and examined her about the police reports she and Officer William White prepared after their interviews with the Mannings girls the night of the murders. The accused claims that Officer Childerous' testimony regarding prior inconsistent statements seriously undermines the Mannings girls' testimony at trial. To the extent that Officer Childerous' testimony disclosed prior contradictory statements made by the Mannings girls, it must be considered as affecting the girls' credibility. Hence, these apparent contradictions were factors for the jury to consider. (*People v. Morgan*, 28 Ill. 2d 55, 190 N.E.2d 755 (1963); *People v. McCoy*, 133 Ill. App. 2d 416, 273 N.E.2d 430 (1st Dist. 1971).) None of the discrepancies or inconsistencies complained of were used as substantive evidence at trial but were all brought out by defense counsel for impeachment purposes.

■■ Defendant has raised other minor points which merit no discussion here. The resolution of all matters complained of was properly within the province of the jury and we will not disturb their findings absent a determination that the evidence is so improbable or unsatisfactory as to suggest a reasonable doubt of defendant's guilt. (*People v. Williams*, 60 Ill. 2d 1, 322 N.E.2d 819 (1975); *People v. Stringer*, 52 Ill. 2d 564, 289 N.E.2d 631 (1972).) We have reviewed the record and have no doubt of defendant's guilt. We note, of course, that the jury was under no obligation to believe defendant's alibi evidence. *People v. Williams; People v. Clark*, 52 Ill. 2d 374, 288 N.E.2d 363 (1972).

■■ Next, defendant contends that the prosecutor's closing argument denied him a fair trial. In particular, defendant asserts that the prosecutor "argued facts not in evidence, misstated both law and fact, accused defense counsel of trickery, and misstated to the jury the defendant's theory of defense."

Defendant's first allegation is that the prosecutor improperly injected the absence of blood tests into his opening argument. The State did not introduce any evidence regarding the type of blood found near the victim or on the murder weapon. A stipulation, used by defendant as part of his case, informed the jury that while blood samples were taken from the scene and preserved as evidence no tests were made upon the sample to identify the blood type. Defendant, in closing argument, attempted to use the lack of blood tests to convince the jury that the police had failed to investigate thoroughly all evidence of the offense. In its closing argument the State attempted to offer an excuse for the absence of tests by telling

the jury that no facilities were available at reasonable expense to obtain the tests. Objection to the statement was sustained.

The State argues that defense counsel "opened the door" to this line of argument and that the response was therefore proper. (See *People v. Anderson*, 48 Ill. 2d 488, 272 N.E.2d 18 (1971); *People v. Davis*, 18 Ill. App. 3d 793, 310 N.E.2d 682 (1st Dist. 1974).) We disagree. While perhaps provoked, the State's purported excuse was based on facts not in evidence and was therefore improper. Our holding, however, does not require reversal. Objection to the argument was promptly made and sustained. Furthermore the purported excuse did not affect the stipulation, which was only that no tests were made, or the force of defendant's use of this evidence in argument. We believe that in the face of the overwhelming evidence of defendant's guilt the improper remarks of the prosecutor were harmless beyond a reasonable doubt and did not affect the outcome.

■■ Defendant's next argument concerns the prosecutor's remark in rebuttal that he could not introduce evidence of prior threats by defendant against the victim. Defendant, however, concedes that these remarks were made in response to defense counsel's argument. We believe that the State could therefore respond (see *People v. Slaughter*, 29 Ill. 2d 384, 194 N.E.2d 193 (1963)), even though he may have misstated the law that the State was prohibited from introducing evidence of prior threats against the victims. We cannot determine how defendant could have been prejudiced since the trial court sustained defense counsel's objection and told the prosecutor that his statement of the law was incorrect. The incident complained of, in our opinion, did not influence the jury's verdict. Even if the jury divined from this exchange the veiled implication that the State had evidence it did not present, we would find no error. We recognize that juries in such situations might be perplexed by the exchanges between court and counsel and will follow the court's instructions that it is their duty to weigh the facts in evidence rather than the statements or arguments of counsel.

Defendant's third argument concerns remarks made by the prosecutor in rebuttal about the relationship between defense counsel and defendant's friend, William Jeffries, and certain statements made by Jeffries to defense counsel. The accused also complains about the prosecutor's characterization of defense counsel's argument as an "act" before the jury.

Again we find that the prosecutor's remarks, while vigorous, were within the bounds of proper closing argument. The evidence shows that Jeffries had given contradictory statements to the police after his arrest. Defense counsel elicited testimony from Jeffries on cross-examination

that the witness had discussed these contradictions with defense counsel before trial. Jeffries also testified on cross-examination that the reason he had not told defense counsel that he had been subpoenaed by the State was that counsel "never asked." He denied that anyone instructed him not to tell defense counsel that he was going to testify for the State.

■■ In closing argument defense counsel made the following remarks, "What about Jeffries who was up here last week under our subpoena who didn't tell me that because they mailed him one. I had him served a subpoena who changes his story." By this argument defense counsel suggested that Jeffries had deceived counsel about the State's subpoena and had changed his story after receiving the State's subpoena. We believe that the prosecutor's remarks about William Jeffries' testimony and his characterization of defense counsel's argument as "an act" in rebuttal did not deny defendant a fair trial, and in no way affected the verdicts.

■■ Next, defendant insists that the prosecutor misstated defendant's theory of defense to the jury. Our review of the record discloses no mischaracterization of defendant's case by the prosecutor. Defendant attempted to establish an alibi. The record in no way supports defense counsel's closing argument that defendant relied on a defense of self-defense. To establish self-defense defendant would have had to admit he was at the scene of the crime. This he flatly denied. Defendant's contention is misplaced and totally lacking in merit. For all of the foregoing reasons, we conclude that defendant received a fair trial.

■■ Defendant finally contends that the concurrent sentences of from 100 to 300 years are excessive. We disagree. It is not the function of reviewing courts to alter sentences within the statutory limits unless it is determined that the trial court manifestly abused its discretion. (*People v. Taylor*, 33 Ill. 2d 417, 211 N.E.2d 673 (1965); *People v. Grau*, 29 Ill. App. 3d 327, 330 N.E.2d 530 (5th Dist. 1975).) Defendant committed two intentional, senseless and brutal murders in the sight of two young stepdaughters. Although we agree with defendant that he may not have known of their presence, we believe that it was a reasonably foreseeable consequence. In addition, we believe the court properly noted defendant's past affinity for the use of firearms and his obvious failure to learn from his prior experiences. Although we note that defendant was employed and had supported his deceased ex-wife during the marriage, we believe that any reduction of the sentence would deprecate the seriousness of the offense.

The judgment of the Circuit Court of St. Clair County is affirmed.

Affirmed.

EBERSPACHER and JONES, JJ., concur.